## THE CITY OF GUTHRIE v. H. C. BEAMER.

1. TOWNSITE LAWS—*Act of Congress—Construction.* By the terms of the act of congress approved May 14, 1890, for entry of townsites in Oklahoma by three trustees, to be appointed by the secretary of the interior, the secretary of the interior may, under rules and regulations promulgated by him, cause the lands occupied for townsite purposes to be surveyed and platted into lots, blocks, streets and alleys, or he may, through the trustees, adopt any survey and plat which had previously been made by the inhabitants of the townsites. And when a survey and plat had been made and adopted by the inhabitants prior to the passage of this act, and afterwards the secretary of the interior adopted and approved such survey and plat, the act of congress and the action of the secretary of the interior thereunder was in effect a dedication to the public uses of all such portions of the townsite as were designated on such plat as streets and alleys, and had the effect to divest any individual claim by settlement or occupancy to such portions.

2. PUBLIC DOMAIN—*Congress Has Exclusive Power Over.* Congress has exclusive power over the disposition of the public domain, and may, by appropriate legislation, divest any interest acquired by settlement or occupancy at any time prior to an entry of the land.

3. SAME—*Vested Interest Not Acquired Until Entry Is Made.* One claiming public lands as a homestead pre-emption or townsite settler acquires no vested interest as against the United States until an entry is made at the proper land office.

4. CITY OF GUTHRIE—*Provisional Government—Survey—Dedication of Streets.* The lands upon which the city of Guthrie is located were settled upon and occupied for townsite purposes on April 22, 1889, before any survey had been made for the townsite and without any reference to the necessity for streets, blocks and lots, every portion of the tract being occupied by claimants   Within a short

time the inhabitants organized a provisional government for their own protection and guidance, and through such government adopted a survey and plat of the townsite on which was designated streets, alleys, blocks and lots, and the same were generally accepted and the settlers conformed themselves to said survey.   Prior to the act of congress approved May 14, 1890, there was no law in Oklahoma under which townsites could be entered.   After the adoption of this act the secretary of the interior caused said townsite to be entered by three trustees appointed by him, and adopted and approved the survey and plat formerly made by the inhabitants of the townsite and conveyance was made of the lots according to said plat.  Beamer claimed, as an occupant, a parcel of ground situated in one of the designated streets.   No entry of the townsite had been made prior to the approval of the act of May 14, 1890.  *Held*, That the adoption and approval of such plat was a dedication by the United States of the lands designated on such plats as streets, and that the interest of Beamer as an occupant was divested by such action, and he has no claim against the city or against the trustees for a conveyance.

5. VESTED RIGHT—*When Not Acquired*.   No vested right as against the United States is acquired until all the prerequisites for the acquisition of the title have been complied with.  (*Ard v. Brandon*, 157 U. S. 537.)

*Error from the District Court of Logan County.*

*Keaton & Cotteral* and *B. T. Hainer*, for plaintiff in error.

*Harper S. Cunningham*, for defendant in error.

The opinion of the court was delivered by

BURFORD, J.:   This was an action brought in the district court of Logan county by the defendant in error, Henry C. Beamer, against the board of townsite trustees, appointed by the secretary of the interior and assigned to the city of Guthrie, under the act of congress approved May 14, 1890, and the city of Guthrie, defendants, to compel a conveyance to him by said trustees of a parcel of ground embraced within the townsite of Guthrie, and located on a portion of the tract laid out and used for a public street in said .

city. Issues were formed, trial had to the court upon an agreed statement of facts, and a finding had and d'ecree entered in favor of Beamer, by which the parcel of land claimed by him was awarded to him in fee and a conveyance directed to be made to him of said parcel or lot. From this judgment the city of Guthrie comes to this court by petition in error, praying for a reversal of said judgment.

The agreed statement of facts contains all that is necessary for a proper understanding of the case. Said stipulation is as follows:

"Be it remembered, that on this 28th day of November, 1893, for the purpose of saving expense in said cause, it is hereby agreed and stipulated by and between the above named parties, plaintiff and defendant, that the facts in said cause are as follows, viz:

"That F. A. Morrison settled upon the piece of land described in the complaint on the 22d day of April, 1889, for the purpose of trade and business, and was in the actual and peaceable and undisputed possession of the same; that on the 23d day of April the plaintiff purchased the possession of the said Morrison and all his right, title, interest and claim thereto and paid him for the same the sum of one hundred dollars, and entered into the actual, peaceable and undisputed possession thereof, and settled upon, occupied and claimed the same for the purpose of trade and business and residence under the provisions of §§ 2387 and 2388, Revised Statutes of United States; that he at once began the improvement of the same by constructing on the east and west sides thereof and south end a fence, and built upon the north end a house 14 x 16 feet in size with lumber, and established his residence and place of business therein; that he remained in the peaceable and undisputed possession of said piece of land at all times from the 23d day of April until the 20th day of May, 1889, on which date he was thrown off of said piece of land by J. A. Acklin, B. F. Daniels and W. W. Angel, acting under the direction of Hendrick D. Baker, who acted as city marshal of the provisional city of Guthrie pursuant to the orders of the

said city government; that he protested against said action.

"That about June 10, 1889, he went upon said tract again and built the foundation for a building 16 x 20 feet in size; that he was again evicted by persons acting in behalf of the said city of Guthrie and thrown off of the land by force of arms.

"That on the 10th day of August, 1889, he again entered upon said land, hauling several loads of building material upon the same for the purpose of erecting permament improvements thereon, and he was again evicted by force of arms and prevented from occupying said lot by the said city government.

"That upon the 2d day of August, 1890, after the alleged provisional city government had ceased to claim to exist, and its officers had ceased to act, he fenced said land and placed a building 8 x 10 feet in size (constructed of lumber) thereon and occupied the same as a place of business, and that on the 6th day of August, 1890, he was again evicted and dispossessed, and his building and other property thrown from said premises by one E. P. Kelly, who acted by orders of one W. S. Spencer, who was the mayor of the village of Guthrie, which upon said date had been organized under and by virtue of the laws of Nebraska, which were then in force in said territory; both said Kelly and Spencer acted without process of law, and by virtue of their claimed authority as municipal officers of the then village of Guthrie.

"That on the 20th day of August, 1890, he again reduced said premises to actual possession and fenced the same, and had begun the erection of a stone house thereon 20x40 feet in size, by grading a foundation and hauling four cords of stone; that the said city officers above named threatened and were about to again evict this plaintiff from these premises when he procured from the district court of Logan county a temporary order of injunction restraining them from in any way interfering with his possession or improvements on said premises until the further orders of said court; that said injunction has remained in force until the present time, and is now in force, and his posses-

sion of said premises has continued undisturbed until the present time.

"That he was the first and prior settler on said lands; that he never consented or acquiesced in the use of any portion of said lands by the public of the city of Guthrie for a street or alley or highway or any other purpose.

"That since the 22d day of April, 1889, he has been an actual *bona fide* resident of the city of Guthrie, and was duly qualified under the law to take a lot and acquire property under the laws of the United States governing townsites in Oklahoma.

"That on the 2d day of August, 1890, the above named Daniel J. McDaid, William H. Merriweather and John H. Shanklin, who had been before that time appointed as townsite trustees and assigned to duty at Guthrie under the provisions of the act of May 14, 1890, made proof and acquired title to the east half of section 8, township 16, north of range 2, west of the Indian meridian, for the use and benefit of the occupants thereof, and gave notice by publication that they were ready to consider the claims of all occupants; that pursuant to said notice plaintiff duly made and filed his application for said piece of land with said board, and thereby asked them to make, execute and deliver to him a good and sufficient deed therefor; that no other person whatsoever made or filed any application for said piece of land; that the plaintiff has at all times been willing to prove by competent testimony the facts herein and in said application set forth, but that said townsite board refused to allow a hearing on said application and without notice to plaintiff dismissed his application, for the reason that on the plat which they had theretofore adopted, the tract of land applied for was embraced in the limits and a part of Third street of the city of Guthrie.

"That the city of Guthrie has never by the right of eminent domain instituted condemnation proceedings or purchased from the said Beamer, or sought to extinguish the claim of Beamer to said land; that the plaintiff demanded of the townsite board a deed for said land, and tendered them the amount of their

necessary expenses for making the same, and they re-
fused to comply with his request.

"That on the afternoon of April 22, 1889, several
thousand people settled upon the east half of sec-
tion 8, township 16, north of range 2, west of the Indian
meridian, and claimed the same as a government
townsite, and began the erection of buildings and
other improvements thereon for townsite purposes.

"That on the 22d day of April, 1889, and the early
days thereafter, the townsite settlers and occupants
of said east half of section 8, organized themselves
into the provisional government of the City of Guth-
rie, said organization being perfected for the purpose
of adjusting said townsite inhabitants on said land,
and maintaining order thereon, and for the purpose of
surveying and platting said townsite into lots, blocks,
streets and alleys, and in said organization a mayor,
councilmen, city clerk, city marshal and other officers
were selected by said inhabitants who proceded to
survey and plat said land into lots, blocks, streets
and alleys, and on the 13th day of May, 1889, the said
mayor and councilmen adopted a plat of said townsite
of Guthrie, a true copy of which, excepting the certi-
ficates of the engineer and officers thereto is hereto
attached, marked 'Exhibit A,' and made a part of this
agreed statement; that the width and length of lots,
and the width of streets and alleys on said plat are
designated in figures thereon.

"That after said plat was made, executed and certi-
fied by the engineer and the provisional officers of
the city of Guthrie, a copy thereof was kept in the
office of the register of deeds of the said provisional
government of the city of Guthrie, and another copy
thereof was filed with the declaratory statement of
the mayor and officers of said provisional government
in the United States land office at Guthrie, Oklahoma,
and said plat was thereafter generally recognized by
the inhabitants of the said townsite.

"That when said survey and plat was completed
the tract of land here in controversy was within Third
street where the same opens up into Harrison avenue,
on the south side, it being thirty feet off of the west

42

side of said Third street extending south from the south side of Harrison avenue 140 feet.

"That at the time of the making and approving of said survey and plat by the inhabitants of the said townsite and provisional city of Guthrie, the townsite settlement was general from the government acre west and south as far as the land in dispute were contiguous, no lots being left unoccupied or vacant for streets, and Harrison avenue from West Third street and east to Division street and Second and First streets between Oklahoma and Harrison avenues were like the other lands adjacent thereto, covered with townsite occupants, and remained so until the occupants were cleared from the streets by the provisional city authorities of Guthrie.

"That after the entry of said townsite by said trustees, and before giving notice to the occupants to present their claims, the said trustees approved the survey and plat, marked 'Exhibit A,' of the inhabitants of said townsite of Guthrie, and made and executed, in accordance with the instructions of the secretary of the interior, their plat of said townsite of Guthrie, conforming to the plat made by the townsite inhabitants, in quadruplicate, and filed one of the same in the office of the county clerk, now register of deeds of Logan county, Oklahoma Territory, and one of the same in the United States land office at Guthrie, Oklahoma Territory, and one of the same in the office of the secretary of the interior, Washington, D. C., and retained one in their own office, the said plat being filed in the United States land office aforesaid and register of deeds aforesaid, August 30, 1890, and the said plat was approved by the secretary of the interior; that from and after about the 20th day of May, 1889, all of Harrison avenue, and all of Third street, excepting the part in the possession of the plaintiff as herein stated, has been used as a public street and highway by the city of Guthrie; that lasting and valuable improvements, by way of frame and brick buildings, have been built on Harrison avenue, on the north side and opposite Third street, and the same have been ever since used for business and other purposes.

"It is hereby agreed that all instructions of the com-

missioner of the general land office and secretary of the interior relating to townsites on public land in Oklahoma are a part hereof, the same as if they were herein set out.

"Executed in triplicate.

"HARPER S. CUNNINGHAM,
                "Attorney for Plaintiff.
"A. G. C. BIERER,
                "Attorney for Defendant.
"J. L. PANCOAST,
                "City Attorney."

The townsite of the city of Guthrie is located on a portion of the lands opened to settlement by the act of congress approved March 2, 1889, and were, prior to their settlement, embraced within the country known as the Indian Territory.

Section 13 of the act approved March 2, 1889, providing for the opening of the Oklahoma lands to settlement, contains the following provision in reference to townsites:

"The secretary of the interior may, after said proclamation and not before, permit entry of said lands for townsites under §§ 2387 and 2388 of the Revised Statutes, but no such entry shall embrace more than one half section of land."

At the time said lands were opened to settlement, on the 22d day of April, 1889, no provision had been made by congress for any form of civil government within the territory opened to settlement at said time. There was no authority for organizing town or city governments, and there were no county organizations, or any law under which such municipalities could be organized, hence there was no machinery by which the provisions of §§ 2387 and 2388, R. S. U. S. could be carried into operation. This condition of affairs continued to exist until the adoption of the act of congress approved May 2, 1890, providing for a territorial government for the Territory of Oklahoma,

but before steps could be taken to enter said townsites by the authorities authorized by the act constituting the territorial government, congress passed the act authorizing the lands settled for townsites within the Territory of Oklahoma to be entered and proved up by trustees, appointed by the secretary of the interior.

United States Statutes at Large, vol. 26, p. 109, § 1, of said act, provides:

"That so much of the public lands situated in the Territory of Oklahoma now open to settlement as may be necessary to embrace all the legal subdivisions, covered by actual occupants for purposes of trade and business, not exceeding twelve hundred and eighty acres in each case, may be entered as townsites for the several use and benefit of the occupants thereof by three trustees, to be appointed by the secretary of the interior for that purpose, such entry to be made under the provisions of § 2387 of the Revised Statutes as near as may be. And when such entry shall have been made, the secretary of the interior shall provide regulations for the proper execution of the trust by such trustees, including the survey of the land into streets. alleys, squares, blocks and lots when necessary, or the approval of such survey as may already have been made by the inhabitants thereof, the assessments upon the lots of such sum as may be necessary to pay for the lands embraced in such townsite, costs of surveyor, conveyance of lots and other expense, including compensation of trustees."

Section 22 of the Organic Act of the Territory of Oklahoma, approved May 2, 1890, 26 Statutes at Large, p. 81, provides:

"That the provisions of title 32, ch. 8, of the Revised Statutes of the United States, relating to reservation and sale of townsites of the public lands, shall apply to the lands open or to be opened to settlement in the Territory of Oklahoma, except those opened to settlement by the proclamation of the president on the 22d day of April, 1889."

This provision had the effect of repealing all the provisions of ch. 8, Revised Statutes of the United

States, p. 436 to 438, so far as the provisions in said chapter relates to the townsite in question, hence, we are compeled to look solely to the provisions of the act of May 14, 1890, to determine the rights of claimants to lots or parcels of land embraced within such townsite. It is a part of the common history of the country of which courts take judicial notice, that on the opening of the Oklahoma country to settlement at the hour of noon on the 22d day of April, 1889, several thousand people entered upon the lands now embraced within the townsite of Guthrie for the purpose of acquiring property, and rights as townsite settlers; that said lands had not been platted and no provision had been made for surveying or laying the same off into blocks, lots, streets or alleys, nor was there any provision of law or authority by which the same could have been legally done. It was the general opinion that a large city would at once be built up upon such site. For a number of days all was confusion and chaos. Each individual was seeking to obtain whatever of interest he might be able to acquire by reason of his personal occupancy or such particular improvements as he was enabled to make, and, as shown by the stipulation in this case, every portion of the tract shown on the plat from the government acre, west for several blocks and south a considerable distance, was occupied by persons claiming to be settlers, and no provision had been made, or any of said land left for streets, highways or alleys, and in this confused condition of affairs the people settled the townsite and attempted to acquire an interest in some specific portion or parcel of said tract.

The question of law presented by this case for our determination is, did such persons, under this condition of affairs, acquire such vested rights or interests in any particular portion of land claimed by them as would prevent the same from afterwards being appro-

priated for the use of the streets, which were necessary to the laying off of a town or city.

It is unquestionably the rule, that one who settles upon and improves a lot in a townsite upon the public lands, acquires an interest that he may sell, convey or encumber. (*Hussy v. Smith*, 99 U. S. 22; *Stringfellow v. Cain*, 99 U. S. 610; *Connor v. Pratt*, 99 U. S. 619.)

In *Lamb v. Davenport*, 18 Wall. 313, Mr. Justice Miller in discussing this question said:

"It is sufficient here to say that several years before any act of congress existed by which title to the land could be acquired. settlement of and cultivation of a large tract of land which includes the lots in controversy had been made, and a town laid off into lots, and lots sold, and that these are a part of the present city of Portland. Of course no legal title vested in any one by these proceedings for that remained in the United States, all of which was well known and undisputed. But it was equally well known that these possessory rights and improvements placed on the soil were by the policy of the government genrally protected, so far, at least, as to give priority of the right to purchase whenever the land was sold or offered for sale, and when no special reason existed to the contrary. And though these rights or claims rested on no statute or any positive promise, the general recognition of them in the end by the government, and its disposition to protect the meritorious actual settlers who were the pioneers of emigration in the new territories, gave a decided and well understood value to these colonies. They were the subjects of bargain and sale, and, as among the parties to such contracts, they were valid. The right of the United States to dispose of her own property is undisputed, and to make rules by which the lands of the government may be sold or given away is acknowledged; but subject to these well known principles, parties in possession of the soil might make valid contracts even concerning the title, predicated upon the hypothesis that they might thereafter lawfully acquire the title, except in cases where congress had imposed restrictions on such contracts."

While the above case announced the doctrine, that the possessory rights of townsite settlers may be the subject of barter and sale, it also affirms the principle that such rights, thus acquired, are subject to the right of the United States to make such disposition of the title as congress may deem proper, and the power to make rules and regulations by which lands of the United States may be disposed of or given away is positively asserted.

While it is true that the act of May 14, 1890, provides that the lands occupied for purposes of trade and business, shall be entered by the trustees for the use of the occupants thereof, it also contemplates the entry of platted lands, lands that have been or shall by the trustees be platted into lots, blocks, streets and alleys. While the act recognizes the rights of settlers and occupants in so far as the same are consistent with the purposes of the act, it also authorizes the secretary of the interior to approve any survey that has already been made by the inhabitants of such town, or to provide by regulations for a survey of the land into lots, blocks, streets and alleys, when necessary.

The power of congress over the disposition of the public lands is supreme, and so long as the title is in the United States and no entry of the land has been made under any law of the United States, or no rights of settlers or occupants have attached. congress may make such disposition as the law-making power may declare, although it may work injustice or hardship to claimants for such lands.

The agreed statement of facts show, that long prior to the adoption of the act of May 14, 1890, the townsite of Guthrie had been platted into streets, alleys, squares, blocks and lots, and the inhabitants had generally conformed themselves to such plat and acquiesced in the same. Under the authority vested in him

by congress, the honorable secretary of the interior approved and adopted this plat and set apart all the portion of or parcel of land claimed by Beamer for a public street.    This was an appropriation of this portion of such tract for, and a dedication of the same for a street, and was within the power of congress and the authority of the secretary, unless the claims of Beamer were of such a character at the date of the passage of the act of congress as to have become a vested interest which could not be disposed of by congress.    Hence, it becomes important to determine when the rights of an occupant or settler attach, or a vested interest becomes such.

It is contended by counsel for plaintiff in error that the interest acquired by a townsite occupant is analogous to that of a pre-emption claimant prior to payment of purchase money and entry; while counsel for defendant in error asserts that the rights of a townsite occupant, acquired by settlement, is analogous to that of a homestead settler, and that he acquires a vested right that even congress cannot divest.    We deem it immaterial, under the facts in this case, which of these positions is correct.

The only rights claimed by Beamer were such as he claims to have acquired by a settlement on the tract in dispute and an effort to improve the same.    It is conceded that at the time congress passed the act of May 14, 1890, no entry of any character had been made for the townsite lands, and that there was no provision of law under which the same could be entered.    The only rights of occupants were such as could be acquired under the act of March 2, 1889, which provides:

"The secretary of the interior may, after said proclamation, and not before, permit entry of said lands for townsites, under §§ 2387 and 2388 of the Revised Statutes, but no such entry shall embrace more than one half section of land."

But this provision was subsequently repealed by the force of the provisions of § 22 of the Organic Act. The rights acquired under these provisions were at all times subject to the paramount right of congress to dispose of the public lands, of which the United States was the owner, and to provide the machinery for perfecting any rights that might be acquired or claimed.

There is no difference, in law, as to the time when the rights of a claimant to public lands become such a vested right as that congress may not divest the same or appropriate the land to other purposes.

This question was under consideration by the supreme court of the United States, in the case of *Kansas Pacific Railway Company v. Dunmeyer*, 113 U. S. 629.

In 1862, congress passed an act, granting certain lands to the Kansas Pacific Railway company, (12 Stat. 489) which contained the following provision:

"Every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of said railroad, on the line thereof, and within the limit of ten miles on each side of said road, not sold, reserved or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely filed."

Section 4 of an act of 1864, amendatory to this act, provides as follows:

"And any land granted by this act or the act to which this is an amendment, shall not defeat or impair any pre-emption, homestead, swamp land or other lawful claim."

The railroad company sold the land in dispute to Dunmeyer and conveyed to him by warranty deed. One Miller had a homestead entry on the land at the time the railroad company filed its map of definite location and claimed the land. Dunmeyer sued the railroad company on their warrenty, and the question

as to whether the entry of Miller brought the lands within the exceptions of the grant, was in controversy.

Counsel for the railroad company contended that congress had power to dispose of the land at any time prior to final proof and issue of final certificate of entry. Mr. Justice Miller, speaking for the court, said:

"In the case before us a claim was made and filed in the land office and there recognized before the line of the company's road was located. That claim was an existing one of public record in favor of Miller when the map of plaintiff in error was filed. In the language of the act of congress this homestead claim had attached to the land and it therefore did not pass by the grant.

"Of all the words in the English language this word 'attached' was probably the best that could have been used. It did not mean mere settlement, residence or cultivation of the land, but it meant a proceeding in the proper land office by which the inchoate right to the land was initiated. It meant that by such a proceeding, a right of homestead had fastened to that land, which could ripen into a perfect title by future residence and cultivation. With the performance of those conditions the company had nothing to do, the right of the homestead having attached to the land, it was excepted out of the grant as much as if in a deed it had been excluded from the conveyance by metes and bounds."

This case is conclusive of the question as to the time when the rights of a homestead or pre-emption claimant attach to the land and the power of congress to deal with the land ceases. It is when the entry is made at the land office and not before. Such right is not acquired by settlement, occupancy or improvement. It is true the laws of the United States provide that a homestead settler upon the public lands may have ninety days in which to make his entry at the land office, and, when such entry is made, his rights shall relate back to the initiation of his settle-

ment, but this is in the nature of a privilege extended to settlers, and such rights do not become fixed until the entry is made, and at any time prior to the making of the entry at the land office, congress may dispose of the land by grant, donation or dedication, as has frequently been held by the supreme court of the United States in pre-emption claims.

If the rights of a pre-emption or homestead claimant do not attach to the land as against the United States until the entry of the land is made, then we know of no reason why the settlement or improvement of a townsite occupant will entitle him to any greater or superior rights.   And applying the rule applicable to homestead and pre-emption claimants as announced by Mr. Justice Miller, *supra,* which we think is applicable to the case at bar, congress had the right and authority to make such disposition of the lands embraced in the Guthrie townsite for streets, alleys and public highways as, in the wisdom of the law-making power, seemed proper, and the authority vested in the secretary of the interior to adopt a plan and survey already made, carried with it, when such adoption was made, an express dedication of the lands shown on the plats, as streets, to the public uses and divested all claims of private parties.   A different rule would apply if the dedication had been attempted by the trustees or by congress after the land was entered for the benefit of the occupants; the dedication of the lands for streets by the act of congress and the action of the secretary relates to the time of the adoption of the statute, or probably to the date of the adoption of the plat by the inhabitants.

And herein lies the distinction in, and misapplication of, the long list of cases cited by counsel for defendant in error.   They are cases where the land had been actually entered for the use of the occupants, and after the entry the trustees or municipal authori-

ties were attempting to change the status of parties as they existed at the time of the entry. It was not done by authority of congress in these cases, and it was properly held that the trustees could not divert the purposes of the trust.

A review of some of the most prominent of these cases will reveal the fact that they are not in point in this case.

In the case of *Bingham v. Walla Walla*, 13 Pac. 411, decided by supreme court of Washington, a town had sprung up on the public domain which had grown to be a city of considerable proportions. The townsite was entered and patent issued to the corporate authorities under an act of congress approved March 2, 1867. (14 U. S. Statutes at Large 541.) This act makes no provision for the making and presentation of a plat of townsites entered under its provisions. In 1858, one Patton had entered upon and occupied a lot of land, fronting on Monroe street twenty-three feet by one hundred and twenty. He erected a building thereon 23x70 feet, the remainder of the lot was fenced. On November 22, 1862, Patton conveyed the lot to one Baker. In 1874, Baker conveyed the lot to Stevens and Stevens conveyed to Bingham in 1883. In 1885, the building on the lot was destroyed by fire and Bingham fenced the entire lot and prepared to build on same. At this time the city of Walla Walla made claim that eleven feet of the lot was in First street, as shown by the plat adopted by the municipal authorities. The lot was occupied its entire width at the time the land was entered for townsite purposes.

Bingham brought suit to quiet his title to the eleven feet claimed by the city for street purposes. The court held that he was an occupant of that particular tract at the time the entry was made and that the entry was made in trust for the actual occupants, and that the only powers of the trustees were to determine

the extent of the occupancy of each occupant and to convey the same as it might appear, and entered a decree quieting his title.

In the act of congress under which the townsite was entered, appears the following provision:

"The execution of which trust, as to the disposal of the lots in such town, and the proceeds of the sales thereof to be conducted under such rules and regulations as may be prescribed by the legislative authority of the state or territory in which the same may be situated."

The court said:

"This authority cannot relate to lands held by actual occupants, but evidently has relation to the lands included in the townsite not in possession of actual occupants or to which the act contemplates a disposal by the city for purposes and under such regulations to be prescribed by the legislative authority."

Certainly no such narrow construction can be placed upon the act of May 14, 1890, under which Guthrie was entered. This act gives, in specific terms, the right to adopt a survey and plat already made, or, if in his judgment it should be found necessary, the secretary of the interior was authorized to cause a new survey to be made and lay the townsite off in blocks, lots, squares, streets and alleys, and, unquestionably, this power extended to all the lands embraced in the townsite, whether actually occupied or not, and hence, the *Walla Walla* case cannot be taken as authority in the case under consideration.

That case followed the rule announced by the supreme court of the United States in *Ashly v. Hall*, 119 U. S. 526, wherein the court said:

"The power vested in the legislature of the territory in the execution of the trust upon which the entry was made, was confined to regulations for the disposal of the lots and the proceeds of the sales. These regulations might extend to provisions for the ascertainment of the nature and extent of the occupancy of

different claimants of lots, and the execution and delivery to those found to be occupants in good faith of some recognition of a title in the nature of a conveyance.   But they could not authorize any diminution of the rights of the occupants, when the extent of their occupancy was established.   The entry was in trust for them, and nothing more was necessary than an official recognition of the extent of their occupancy."

There is no question but this is the correct rule, applicable to all classes of cases, where the lands are entered for the use and benefit of the actual occupants, and congress had established no rule for determining the extent and nature of the rights of the public in the lands entered for townsite purposes.

*City of Helena v. Albertrose et al.* 20 Pac. 817, is another of the class of cases relied upon by defendants in error, but is clearly distinguishable from the case at bar.   The city of Helena was built upon public land, and such land entered by the probate judge, under § 2387 R. S. U. S.   The premises in controversy were at the time of the entry, and had for a long time prior thereto, been in the actual possession and occupancy of the defendants.   After the entry of the townsite, a survey and plat were made and the tract in dispute was included in Lawrence street, as shown on the plat.   The city brought suit in ejectment.   The court said:

"When the patent was issued to the probate judge he became a trustee of the lands included in the patent, holding the same in trust for the use and benefit of the occupants thereof, which trust must be executed by him in accordance with the laws of the United States creating such trusts and with the regulations provided by the territoral laws not in conflict with the laws of the United States.   These rules or regulations might guide the mode or manner of executing the trust, but they could not substitute one *cestui que trust* for another.   In other words, neither the law of this territory nor the act of the probate judge could deprive any person of the land occupied by him at the

time when the probate judge made entry for the town-site, and give such land to one who was not an occu-pant thereof, and any attempt so to do would be null and void. Undoubtedly the laws of this territory providing for a map, and the act of the probate judge in accordance therewith were valid and not in con-flict with the laws of the United States, when such map designated and established as streets those por-tions of the townsite which had theretofore been used by the public as streets, but when the probate judge undertook to establish by that map a street over lands actually occupied by individuals as a residence when the entry was made by the probate judge, his act was in conflict with the proper execution of his trust, which was to convey the lands to occupants when there were occupants and not to others, and the public had no right as against such an occupant. The act of the probate judge, therefore, was void, at least as far as it attempted to deprive occupants of their interests in lands occupied by them, and such act could give to the public no title to the premises against the will of the true occupants."

It will be observed that in the foregoing case there was an attempt by the city authorities to divest the interest of the claimants, after entry of the lands, by appropriating a portion of the land occupied by them for a street. In this the case is materially dif-ferent from the case at bar.

The case of *Winfield Town Co. v. Moris et al.*, 11 Kan. 128, is cited in support of the contention of defendant in error. We find nothing in the case in conflict with our views in this case. The court there held that where the probate judge entered a townsite he must convey the lots and parcels of land to the actual occu-pants, and that a deed made by him to one who was not an actual occupant at the time of the entry was void, and also that the Statutes of Kansas, in so far as it attempted to make all persons occupants who selected and laid out a townsite was inoperative and void. We fully concur in this view of the law.

In *Treadway v. Wilder*, 8 Nev. 92, the trustee of the townsite gave a deed to one who was not an occupant of the townsite at the time of the entry.   This act was held to be void and to convey no title.

In *Rathburn v. Sterling*, 25 Kan. 444, the court held that the trustee must convey the lots to the persons who were occupants at time of entry of townsite, but in both the above cases the entry was made by the probate judge under the provision of § 2387, Revised Statutes of the United States.

In the case of *Clark v. Titus* (Ariz.), 11 Pac. 312, the court held that lands entered under § 2337, were held in trust for the use of the occupants, and that a deed conveying a large number of lots to a town company was invalid.

In *Guffin v. Linn*, 26 Kan. 717, it was held that the probate judge had no authority to convey to one not an occupant of townsite at date of entry.

We have examined all the authorities cited by counsel for defendant in error in support of the judgment in this case, but find nothing that conflicts with our views in this case.

It is well settled that as between adverse claimants to public lands, that he who is first in time, the law having been otherwise complied with, is first in right, but this rule has no application against the United States.

The right of congress to dispose of the public lands is a power granted by the constitution, and every person who initiates a claim to any portion of the public domain, takes such right subject to this power of congress, and such power of disposal continues until the United States has estopped herself to divest such right by accepting something of value from the claimant and permitting an entry of the land at the proper land office.

When the secretary of the interior, or the trustees appointed by him, under his instructions adopted and approved the plat of the townsite of Guthrie, which the inhabitants had made long prior to the entry of the land by the trustees, the lands designated as public streets on such plats, were dedicated to the public use, and the act of congress and the action of the secretary under the power vested in him by said act, had the effect to divest any individual interest that might have been asserted to such portion of said land, and Beamer has no rights or interest in the public streets which can be conveyed to him by the trustees.

The district court erred in directing a conveyance to him of the parcel of ground in controversy.

There is another view of this case which we think defeats the defendant in error in his claim for title to this lot.

It is a part of the general history of the settlement of the City of Guthrie, that prior to the opening of the country to settlement on April 22, 1889, and prior to the settlement and occupancy of the lands embraced in the townsite, no plats had been adopted, and no sub-divisions of the lands into lots, blocks and streets had been made, and no valid or legal survey, plat or sub-division could have been made until after the lands were open to settlement.    Thousands of people desiring to acquire lots in the projected city, went upon the lands now constituting the city of Guthrie, and each for himself undertook to acquire by occupancy or improvement some particular portion of said tract for his own use.    As a natural result there was no order or regularity in such settlements, and everything was chaos and disorder.    There was no municipal government and no authority for any. There was no law in the territory at that time by which a municipal government could be formed, and no person had authority to act for the masses.    It

City of Guthrie v. Beamer.

became necessary to bring order out of chaos, and to settle the many conflicting interests by some general rule or authority that the masses would recognize. "The very nature of land settled upon and occupied as a townsite, implies the existence of streets, alleys, lots and blocks, and for the possession of the lots and their convenient use and enjoyment, there must of necessity be appurtenent to them a right of way over adjacent streets and alleys. The entry of the land carried with it such a right of way. The streets and alleys were not afterward at the disposal of the government, except as subject to such easement." (*Ashby v. Hall*, 119 U. S. 526.)

Every person who attempted to settle upon said lands, in such chaotic state, established his settlement rights with full knowledge and notice of the fact that before the same could be entered as a townsite or any title acquired from the government, that such lands must of necessity be platted and laid off into blocks, lots, street and alleys, and took whatever of interest he acquired, subject to this right, and whatever would result from it. Prior to such platting and sub-division, no person could acquire any interest in any definitely described or particularly bounded portion of said tract. There was no way by which it could be determined what the quantity of land would be that would fall to the portion of any settler or occupant. The title acquired by a townsite settler, and the interest acquired by such settler by occupancy or improvement, is in and to a lot or lots—such lot or lots must be determined by a plat, survey and sub-division adopted in some manner, and generally acquiesced in.

Recognizing this uncertain, chaotic and disorderly condition of affairs, the experience and intelligence of the American people asserted itself, and they made a rule and law for themselves, and organized commit-

tees by and with the consent of the settlers, and em-
powered them to make surveys and plats and to bring
order out of confusion.   The people generally acqui-
esced in this action and adopted the result of their
work and conformed their settlements to the lines of
the blocks, lots, streets and alleys, as designated by
such committees and the provisional government, or-
ganized by the people for their own guidance and gov-
ernment.

This step was necessary in order that the settlers
might acquire some definite location and become occu-
pants of some definite portion of said tract, otherwise,
a townsite never could have been entered or title
acquired, as every portion of the tract was occupied
and claimed by some person.   When these surveys and
plats were made, those who were so unfortunate as to
have made their location in such portions of the tract
as were required for streets, were bound to give way,
as they had taken their chances in the great lottery for
a lot when they stuck their stake, and had drawn a
blank.   All could not be on lots, and this they all
knew.   Some were on lands that had to be used for
streets, in laying off a town, and this they all knew.
Without streets and blocks and lots there could be no
town, and this they all knew, hence, no specific inter-
est could be acquired until there was a particular sub-
division to which such right could be attached.   The
people were several days in bringing order out of con-
fusion, and the provisional government, which had
been organized with the consent of the governed, was
charged with the duty of providing some means of
communication between the various portions of the
city.

The stipulation shows that every portion of the
lands, embracing several blocks, in the vicinity of the
disputed portion, was claimed by occupants, and that
there was no reservation or provision for streets.   All

knew this when they settled in this confused state, with no uniformity of action, and each must have known when he staked a lot and erected a temporary structure of any kind, that so soon as streets were laid off, that those who were in the way of the march of progress would have to surrender their settlements. The laws, as enacted by our legislators, never contemplated such a condition of affairs. The mind of man had not conceived or history recorded the building of a city of twenty thousand people in less than a day. At the crack of a gun and the waving of a flag, twenty thousand enthusiastic people assembled in mass, without a commander or subject to any local law, and in less than a day, with wondrous energy, intelligence and enterprise, had laid the foundation and established the boundaries of the future capital of the most remarkable territory that has ever existed. This vast struggling mass of intelligence, each seeking to secure for himself a portion of the tract upon which all recognized that a great trade center was to be builded, left no spot unoccupied; no ground was too poor and no stone was rejected. To this condition of affairs no established rules were applicable. A new order of things was established, which called for additional legislation, or an application of old rules to the changed conditions, and none knew this better than the people who took part in the early settlement of this townsite. Congress recognized this fact, and to meet the requirements of these conditions passed the act of May 14, 1890.

When Beamer purchased the settlement right of Morrison, and attempted to acquire a right to a particular portion of the townsite by occupancy or improvement, he made such purchase and effected such settlement with full knowledge of the conditions that existed, and that no streets had been laid out or subdivisions established, which were necessary in order

to build a city or town, and he knew furthermore that when a survey and plat were made, that he or some other settler would be required by the exigencies of the occasion to vacate their claims and give way to the requirements of the public. Knowing these facts, he voluntarily took his chances with all other settlers and happened to be unfortunate in his location. He was deceived or misled by no one. There was no compulsion on him to act, and he is in no position to complain.

He has no claims for equitable relief, and his cause should be dismissed.

The judgment of the district court is reversed and cause remanded with instructions to render judgment for the defendants in said cause for their costs.

Dale, C. J., and Bierer, J., not sitting; all the other Justices concurring.